UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------X

MATT HARRIS,

        Plaintiff,

  - against -

SOUTH HUNTINGTON SCHOOL
DISTRICT; SOUTH HUNTINGTON
SCHOOL BOARD OF EDUCATION,

        Defendants.

----------------------------X

<u>MEMORANDUM AND ORDER</u>

Civil Action No.
06-CV-3879 (DGT)

Trager, J.:

    Matt Harris ("plaintiff" or "Harris") filed the current
action on August 10, 2006 against his employers, the South
Huntington School District and the South Huntington School Board
of Education (collectively "defendants" or the "School District."
Plaintiff alleged that since 2001, defendants retaliated against
him for his engagement in constitutionally protected speech by
creating a hostile work environment and taking adverse employment
actions against him.[1]  Plaintiff brings his claims for First
Amendment retaliation under 42 U.S.C. § 1983, the New York State
Human Rights Law, New York Executive Law § 290 <u>et seq</u>. ("NYSHRL")
and the New York City Human Rights Law, Title 8 of the
Administrative Code of the City of New York ("NYCHRL").
Plaintiff also brings state law claims for negligent infliction

---

[1] Plaintiff voluntarily withdrew his § 1983 Due Process claims,
and his state law claims for defamation and intentional
infliction of emotional distress.  Pl.'s Opp'n at 1 n. 1.

of emotional distress and violations of civil service law.
Defendants move for summary judgment pursuant to Federal Rule of
Civil Procedure 56(c).  For the reasons stated below, defendants'
motion is granted.


## Background

### (1)

### Fasano

**(A)  Plaintiff's First Complaint Against Fasano**

Plaintiff began his employment with defendants in 1992 as an
electronic technician in the Instructional Media Department ("IMC
Dep't").  Pl.'s Compl. at ¶ 10; Pl.'s Mem. of Law in Opp'n to
Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 1.  From 1992 until
2002 he was directly supervised by Vincent Fasano ("Fasano").
Pl.'s Opp'n at 1.  Plaintiff alleges that Fasano subjected him to
abusive behavior from the very beginning of plaintiff's
employment.  Id.  Although plaintiff complained about Fasano's
conduct on one or two occasions in the early 1990s, he was told
to simply "deal with it."  50-H Hearing of Matt Harris ("Harris
50-H") at 12.  Heeding this advice, for the next few years,
plaintiff lodged no further complaints against Fasano.  Despite
finding it difficult getting along with his supervisor, plaintiff
was able to work cooperatively and productively with him.  Id.

In the Spring of 2001, however, plaintiff filed a complaint with Personnel Administrator Rosemary Ruk regarding Fasano's abusive conduct.[2]  Harris Aff. at ¶ 4.

**(B)  Fasano's Retaliatory Behavior Following the Complaint**

Plaintiff alleges that after complaining about Fasano's conduct, Fasano engaged in a series of retaliatory actions that created a hostile work environment.  Pl.'s Compl. at ¶ 15; Harris 50-H at 34-35.  Fasano's inappropriate conduct included speaking to plaintiff in a demeaning manner, Harris 50-H at 34, threatening to start a "paper war"[3] against plaintiff, Pl.'s Opp'n at 2; Harris 50-H at 15, and assigning plaintiff more menial tasks than he previously received.  Harris 50-H at 34-35.  Fasano also placed a disciplinary memorandum into plaintiff's work file without plaintiff's knowledge or signature, which plaintiff claims was a violation of union rules.  Pl.'s Compl. at ¶ 14. Plaintiff requested that the disciplinary memorandum be discarded because it contained many false statements and he had not received an opportunity to review it, but his request was denied. Id.

---

[2] Plaintiff never specifies whether this complaint was written or not.

[3] Although not entirely clear from the record, the term "paper war," as used by plaintiff, seems to refer to a tactic employed by Fasano where plaintiff would be required to deal with a substantial amount of paperwork, such as filling out daily or weekly work logs.

On June 4, 2001, Fasano distributed a written document specifying certain new work rules that plaintiff and two other employees in the IMC Dep't were directed to abide by. Harris 50-H at 15-16. The rules required employees to keep a daily work log and prohibited them from leaving the boundaries of the school during work hours. Harris Aff. at ¶ 4. Plaintiff believed these rules to be offensive, Harris 50-H at 16, and alleges that they were imposed in retaliation for his complaints against Fasano,[4] Harris Aff. at ¶ 4. Plaintiff conveyed his concerns about the new work rules to his union representative, Randy Tillman ("Tillman"). Harris 50-H at 18. A meeting was then scheduled with Dr. Thomas Shea ("Shea"), the former Assistant Superintendent for Personnel and District Services, to discuss plaintiff's issues with the rules. Id. Following the meeting certain modifications were made to the rules, but plaintiff nevertheless asked his union representative to file a formal grievance. Id. at 19. Tillman, however, refused, explaining

---

[4] In his complaint, plaintiff alleges that one of the types of abusive behavior that Fasano engaged in that led to plaintiff bringing a formal complaint against him was the presentation of the new work rules. Pl.'s Compl. at ¶ 13. In his affidavit, on the other hand, plaintiff claims that the new work rules were instituted by Fasano in retaliation for his formal complaint. Harris Aff. at ¶ 4. The second scenario seems more plausible as plaintiff's opposition memorandum states that the work rules were instituted immediately after plaintiff formally complained about Fasano's behavior. Pl.'s Opp'n at 2.

that it was unnecessary to file a grievance at that time.  Id. at 19-20.

Fasano continued engaging in harassing behavior directed at plaintiff, including: (1) destroying plaintiff's personal Compact Disc player by throwing it down a flight of stairs, (2) throwing a School District owned video player at a wall in front of plaintiff and (3) destroying a School District owned Olympus camera with a band saw in front of plaintiff in order to intimidate him.  Pl.'s Opp'n at 3-4.

**(C)  Plaintiff's Second Complaint Against Fasano**

On December 8, 2001, plaintiff filed a written complaint against Fasano.  See generally Affidavit of Dr. Thomas C. Shea ("Shea Aff.") Ex. C.  Plaintiff reported, among other things, that Fasano used School District owned vehicles for personal use, ran a private business from work, failed to distribute ordered School District equipment and supplies, hung a nude calendar in a locker in their mutual work area, violently destroyed School District owned property and threw out plaintiff's personal CD player.  Shea Aff. Ex. C; Pl.'s Compl. at ¶ 30.  Plaintiff also noted that Fasano berated him by calling plaintiff "'senior technician' knowing full well that he appointed Bob Carpenter to the lead position over [plaintiff] a year and a half earlier." Shea Aff. Ex. C at ¶ 14.  Plaintiff alleges that defendants did nothing to prevent this harassment by Fasano.  Pl.'s Opp'n at 4.

5

Following his second complaint, plaintiff claims that he was subjected to an array of retaliatory actions including being assigned menial work tasks and being denied access to computers, equipment, email[5] and office space. Pl.'s Compl. at ¶ 31. Plaintiff claims that such actions constituted "a form of de facto demotion." Id.

**(D) Meetings with Plaintiff**

After the filing of his second complaint, on December 18, 2001, Ken Aldrich ("Aldrich"), the School District's Business Administrator, held an IMC Dep't team-building meeting attended by plaintiff, Fasano and plaintiff's co-workers, Robert Carpenter ("Carpenter") and Daniel Beach. Pl.'s Opp'n at 4. During the meeting, Carpenter opined that plaintiff was not a "team player." Id. Plaintiff responded by accusing Carpenter of concealing the fact that he had been promoted to Acting Lead IMC Technician. Harris 50-H at 48-49. According to plaintiff, Aldrich then requested plaintiff's resignation. Pl.'s Compl. at ¶ 26; Harris 50-H at 49.

Defendants, on the other hand, deny that plaintiff was ever asked to resign from his position. Shea Aff. at ¶ 12. Instead,

---

[5] From about February 2002 until June 2002, Harris alleges that the School District denied him access to its e-mail server. Harris 50-H at 56-57. Defendants claim that upon learning of this issue, they took immediate corrective action to restore plaintiff's access to the e-mail server. Shea Aff. at ¶ 24.

as evidenced by a memorandum submitted by Aldrich following the team meeting, plaintiff informed Aldrich that he could no longer work with Carpenter or Fasano and demanded that he be given another job within the School District where he would not have to interact with either of them. Id.; Shea Aff. Ex. D at 1. Aldrich then informed plaintiff that there were no other jobs in the School District that were suitable for plaintiff. Shea Aff. Ex. D at 2. Plaintiff, however, continued demanding that he be reassigned. Id. Aldrich then told plaintiff that he would schedule a meeting between himself, plaintiff and Shea. Id. The meeting was scheduled to discuss plaintiff's problems with his supervisor in greater detail.

Later that day, plaintiff met with Aldrich, Shea, Roger Stollen, plaintiff's shop steward, and Tillman, plaintiff's union representative. Harris 50-H at 49-50. The meeting was called to obtain more information from plaintiff regarding his allegations of mistreatment by Fasano. Id. at 50. At the conclusion, plaintiff was instructed that if any other incidents were to transpire between himself and Fasano he should report them immediately. Id. at 52. The next day, plaintiff requested, and was granted, three weeks of paid sick leave. Id. at 52-53. Plaintiff explains that the problems he was experiencing at work, including the meetings he attended the previous day, contributed

to his back pain and mental stress, forcing him to take the time off.  Pl.'s Compl. at ¶ 27.

**(E) Fasano's Continued Harassment**

Plaintiff returned to work on January 4, 2002 at which time he was told that he was no longer supervised by Fasano, and that he was instead to report to Dr. Jim Sullivan, Assistant Superintendent for Instruction at the Walt Whitman High School. Harris 50-H at 54-55.  Plaintiff claims that during this period, the hostile work environment and retaliation against him continued and even got worse.  Pl.'s Compl. at ¶ 29.

Although he no longer had a working relationship with Fasano, according to plaintiff, his former supervisor continued harassing him after learning about plaintiff's second round of complaints.  Specifically, plaintiff alleges that Fasano visited the Long Island School for the Gifted ("LISG"), which plaintiff's daughter attended, and took photographs of her classroom.  Pl.'s Compl. at ¶ 32; Harris 50-H at 59.  Fasano explained that he was present at the school to investigate plaintiff's theft of computers from the LISG.  Pl.'s Opp'n at 5.  Plaintiff claims that following an investigation, the theft accusations were held to be unfounded.  Pl.'s Compl. at ¶ 32.  Plaintiff claims to have been subjected to further harassment from defendants' staff and administration while the investigation into his alleged criminal behavior was ongoing.  Pl.'s Compl. at ¶ 35.

In February 2002, plaintiff went to Fasano's office to
retrieve audio equipment for a school play.  Pl.'s Opp'n at 5.
Plaintiff specifically went to his former supervisor's office in
the evening, knowing that Fasano would not be present.  Harris
50-H at 63.  A night security guard, however, called Fasano at
home, informing him of plaintiff's presence.  Id.  As he was
leaving with the audio equipment, Fasano confronted plaintiff and
pushed him against a wall, breaking a light switch.  Pl.'s Compl.
at ¶ 33.  According to Harris, James Kaden, the School Board
President, was informed of the altercation and asked plaintiff
not to file a police report.  Pl.'s Opp'n at 5.  Fearing further
retaliation if he failed to do as he was told, plaintiff complied
with the request, but did notify the district security force of
Fasano's violent actions.  Id.

Following the physical altercation and additional
allegations against plaintiff concerning his involvement in alarm
sabotage at defendants' middle school, the Superintendent of
Schools, Timothy Brennan ("Brennan"), informed plaintiff that,
except under certain limited circumstances, plaintiff was to
obtain written authorization to access school property.  Id.;
Shea Aff. Ex. E.  According to plaintiff, the new requirement
prevented him from picking his daughter up from school and
hindered his ability to obtain supplies necessary for his job.
Pl.'s Opp'n at 5.  Plaintiff claims that Fasano was not similarly

disciplined.  Harris Aff. at ¶ 11.  He, therefore, concludes that
the disciplinary action was taken by Brennan in retaliation for
his numerous complaints against Fasano.

**(F)  Formal Investigation into Fasano's Activities**

Following plaintiff's second complaint against Fasano, the
School District contracted with Joseph Conlon ("Conlon"), a
former detective with the Suffolk County District Attorney's
Office, to conduct an independent investigation into the various
allegations.  Shea Aff. at ¶ 11.  In June 2002, Conlon submitted
a detailed report confirming many of plaintiff's accusations
regarding Fasano's inappropriate work behavior.  Id. at ¶ 14;
Shea Aff. Ex. F.  In August 2002, based on Conlon's findings,
defendants requested that Fasano take an early retirement.  Shea
Aff. at ¶ 15.

**(2)**

**Carpenter**

**(A)  Carpenter's Promotion**

On February 2, 2000, Carpenter, plaintiff's co-worker in the
IMC Dep't, was internally promoted to Acting Lead IMC Technician
by the Superintendent of Schools.  Defs.' Statement of Undisputed
Facts ("Defs.' 56.1") at ¶ 2.  In either January or February of
2001, not knowing about Carpenter's promotion, plaintiff

10

responded to a posting for "Lead Technician," but never received
an interview for the position. Pl.'s Compl. at ¶ 17. When
plaintiff inquired with Shea, the head of personnel, about the
status of his application, he was told that the position was
withdrawn for budgetary reasons. Id. at ¶ 18-19. It was not
until October 19, 2001, when plaintiff received a list of School
District civil service positions, that plaintiff learned that
Carpenter had been promoted to Acting Lead IMC Technician. Id.
at ¶ 16. Plaintiff asked defendants about Carpenter's promotion,
but did not receive a response. Pl.'s Opp'n at 3. Plaintiff
then wrote a letter to Shea, dated October 24, 2001, requesting
that he confirm the accuracy of the civil service listing. Shea
Aff. Ex. A. Shea replied to plaintiff's letter on October 31,
2001, informing plaintiff that he could not discuss another
employee's personnel matters and reminded plaintiff that he
should contact his union representative if he needed further
clarification. Shea Aff. at ¶ 8. Shea also admonished plaintiff
for the abusive behavior he subjected the Personnel Department to
on learning of Carpenter's promotion. Shea Aff. Ex. B.
Plaintiff claims that Shea's comments were made in retaliation
for plaintiff's inquiries into defendants' violations of civil
service law. Harris Aff. at ¶ 7.

It was not until a November 29, 2001 meeting attended by
plaintiff and his union representative, that defendants admitted

to plaintiff that Carpenter had indeed been appointed Acting Lead IMC Technician. Pl.'s Compl. at ¶ 22; Harris 50-H at 32. Plaintiff claims that "nothing was done to alleviate the discrimination and/or retaliation to which [he] was subjected, and no one was punished for the unlawful conduct." Pl.'s Compl. at ¶ 22. At the same time, however, plaintiff admits that neither he nor his union ever filed a grievance regarding his objections to Carpenter's promotion. Harris 50-H at 33-34. Plaintiff claims that filing a grievance would have been useless since the first steps of any grievance would have been determined by Fasano and Shea, the very people he would have been complaining about. Harris Aff. at ¶ 8. Moreover, filing another complaint would have left him open to further retaliation by defendants. Id. Plaintiff believes that his fear of retaliation was substantiated by a subsequent meeting where Shea advised plaintiff to seek psychological help. Plaintiff perceived the suggestion as a threat to his employment, since Shea was essentially stating that plaintiff was mentally unfit to perform his duties. Id.

Plaintiff alleges that Carpenter's promotion was in violation of civil service law as the Lead IMC Technician position was not posted at the time Carpenter received the promotion. Pl.'s Opp'n at 3. Plaintiff also insists that he was more qualified for the position because he had seniority over

Carpenter and was ranked number one on the civil service list for the position, whereas Carpenter had not even taken the applicable civil service exam.  Pl.'s Compl. at ¶ 20; Pl.'s Opp'n at 3. Moreover, plaintiff claims that defendants lied to him for a year about the status of the position, telling him that it had been withdrawn and denying that any promotion had been made to Carpenter.  Harris Aff. at ¶ 7.  This was all done, according to plaintiff, in an effort to prevent him from obtaining the promotion himself.  Pl.'s Opp'n at 3.  Though Shea denies having had any knowledge of Carpenter's promotion at that time, Shea Aff. at ¶ 7, Harris argues that as the head of personnel, Shea either knew or should have been aware of this information, Harris Aff. at ¶ 7.

**(B)  Carpenter's Harassment Of Plaintiff**

Plaintiff also claims that he was subjected to harassment by Carpenter.  For example, in September 2002, ten months after plaintiff filed his December 8, 2001 complaint against Fasano, Carpenter, along with other employees, filed, what plaintiff alleges to be, an unjustified police report against him for stealing computer equipment.  Pl.'s Compl. at ¶ 39; Harris 50-H at 42-44.  No criminal charges were filed in connection with the incident.  Harris 50-H at 44.  On March 11, 2004, Plaintiff also discovered two messages that Carpenter left for plaintiff's co-worker, James Brtalik ("Brtalik"), where Carpenter made

13

inappropriate references to plaintiff.  Affidavit of James Romanelli ("Romanelli Aff.") at ¶ 7.  On April 2, 2004, after it was determined that Carpenter had indeed left the derogatory messages, Carpenter received a "Memorandum of Counseling and Warning" explaining to Carpenter that "[t]his type of behavior is unprofessional and inflammatory" and that "[i]t boarders on harassment and must cease immediately."  Romanelli Aff. Ex. A (emphasis in original).  Plaintiff claims that he was never informed that the memorandum was issued.  Pl.'s Counter Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1") at ¶ 36.

### (3)

### Brtalik

Following Fasano's retirement in August 2002, defendants reorganized the IMC Dep't into two groups: (1) the Audio Visual ("AV") Department and (2) the Technology Department.  Defs.' 56.1 at ¶ 22.  Carpenter was assigned to the Technology Department, while plaintiff was assigned to the AV Department where he shared a workspace with Brtalik.  Id. at ¶ 23; Harris 50-H at 55-56.  Defendants explain that the reason plaintiff was not assigned to the Technology Department was because he lacked the necessary skills required to work on computer hardware and software issues.  Defs.' 56.1 at ¶ 24.  Plaintiff disputes this fact, and claims

that in addition to possessing the requisite skills, his
qualifications were superior to those possessed by Carpenter, who
was transferred to the Technology Department.  Pl.'s 56.1. at
¶ 23-24.

Plaintiff claims that he had a good working relationship
with Brtalik until his co-worker found out about plaintiff's
prior complaints against Fasano.  Pl.'s Opp'n at 4-5; Harris 50-H
at 57.  Brtalik then began engaging in harassing behavior towards
him, including refusing to communicate with plaintiff and making
false accusations that plaintiff was harassing him.  Pl.'s Compl.
at ¶ 39.  Specifically, Brtalik filed two harassment complaints
against plaintiff, one on September 6, 2002, Shea Aff. Ex. G, and
another on April 13, 2004, Shea Aff. Ex. K.  Mem. of Law in
Support of Defs.' Mot. for Sum. J. ("Defs.' Mem.") at 3-4.
Following Brtalik's first complaint, defendants reassigned
plaintiff to work the night shift and kept Brtalik working the
day shift in an attempt to prevent future altercations between
the two employees.  See Shea Aff. Ex. H.  In exchange for having
to work a later shift, plaintiff was paid a differential equal to
eight percent of his salary, in accordance with his union's
collective bargaining agreement.  Shea Aff. at ¶ 22.  Plaintiff
alleges that the reason defendants moved his shift instead of
Brtalik's was to retaliate against him for his numerous
complaints.  Plaintiff agreed to try the new arrangement for one

year, despite the fact that it was retaliatory in nature, in order to avoid further harassment from Brtalik. Pl.'s 56.1 at ¶ 26; Harris 50-H at 89. Plaintiff complains, however, that having to work the night shift denied him the opportunity to work overtime. See Harris 50-H at 119-20. Brtalik also filed a criminal harassment complaint against plaintiff around the time of his April 13th complaint. Shea Aff. Ex. M; Pl.'s Compl. at ¶ 49. Plaintiff was arrested, but after a bench trial, the case was dismissed and costs were awarded to him. Pl.'s 56.1 at ¶¶ 37-38; Pl.'s Opp'n at 6 n.3. Following his acquittal, plaintiff filed a civil complaint against Brtalik for false arrest. Harris 50-H at 98.

Sometime during this period of harassment, Brtalik created a cartoon focusing on plaintiff called "hairball," which he displayed over a desk in their office. Harris 50-H at 80; Defs.' Mem. at 4. Plaintiff's current supervisor, Wayne Loper ("Loper"), removed the cartoon and gave the original to plaintiff. Harris 50-H at 80. On another occasion, Harris alleges that when he attempted to get a replacement identification card, he discovered that a card had been created with his name, but with a picture of a hairball in lieu of his photograph. Harris Aff. at ¶ 9. It is unclear whether plaintiff believes that Brtalik was responsible for the prank.

In a further attempt to prevent altercations between plaintiff and Brtalik, plaintiff was told not to report to work until his shift began. Shea Aff. at ¶ 32. On June 17, 2004, Brtalik filed his third complaint against plaintiff, claiming that plaintiff failed to follow the specific directions requiring him not to arrive at work prior to the start of his shift. Id. at ¶ 33; Shea Aff. Ex. M. No employment action was taken with respect to this incident. Shea Aff. at ¶ 33. Plaintiff, however, maintains that he abided by the directions he was given. Pl.'s 56.1 at ¶ 40.

Plaintiff also alleges that in June 2004 Brtalik filed a false complaint with the business manager, Connie Robinson, alleging that plaintiff had been tailgating him and causing him to fear for his life. Harris 50-H at 102.

In July 2004, plaintiff requested, and was granted, a change to his employment status from a twelve-month employee to a ten-month employee. Romanelli Aff. at ¶ 9; Romanelli Aff. Ex. B. Plaintiff claims this request was made in an effort to keep himself away from Brtalik since defendants were taking no action to prevent Brtalik from harassing him. Pl.'s 56.1 at ¶ 41; Harris 50-H at 101. In November 2004, Brtalik was moved to another building in the School District at plaintiff's request. Pl.'s Opp'n at 7; Harris 50-H at 107. Plaintiff claims that Brtalik, who still had keys to plaintiff's office, continued to

harass him by moving around and not returning audio visual
equipment and making such equipment difficult to find or
unavailable when plaintiff needed to use it to perform his job.
Pl.'s Opp'n at 7.

## (4)

### Loper

Plaintiff also acknowledges that he does not have a good
working relationship with Loper, his current supervisor.  Harris
50-H at 92.  Specifically, plaintiff complains that "[e]very time
[Loper] sends [him] any kind of a directive, it's done in a very
demeaning way."  Harris 50-H at 118.  Furthermore, in a grievance
meeting, Loper threatened to sue plaintiff for slander.  Harris
50-H. at 118; Pl.'s Opp'n at 7.  Plaintiff, however, does not
allege that Loper's actions are retaliatory in nature.

## (5)

### Sexual Harassment Allegations Against Plaintiff

In a letter dated October 1, 2003, Vic D'Amore ("D'Amore"),
a dance director who was renting the school facilities,
complained to Shea about plaintiff entering the teenage girls'
dressing area without adequate warning and seeing girls in

various states of undress.  Shea Aff. at ¶¶ 25-26; Shea Aff. Ex.
I.  As required by law and School District policy, a Title IX
investigation was conducted to investigate the allegations.  Shea
Aff. at ¶ 27.  A November 25, 2003 summary report cleared
plaintiff of all charges.  Id. at ¶ 28; Shea Aff. Ex. J; Pl.'s
Compl. at ¶ 46.  During this time, however, plaintiff was placed
on paid administrative leave and claims to have experienced great
embarrassment.  Harris 50-H at 79.  Plaintiff alleges that
D'Amore's lighting director is Fasano's business partner, and
that Fasano had something to do with D'Amore making the false
accusation.  Pl.'s Opp'n at 6; Harris 50-H at 78.


**(6)**

**Offensive Internet Postings And Pictures**

Beginning in 2003, plaintiff brought to defendants'
attention internet postings that contained demeaning statements
about him.  Romanelli Aff. at ¶ 6.  Plaintiff claims that these
postings were made by defendants' employees and that many of the
posts originated from School District-owned computers.  Pl.'s
Compl. at ¶ 48; Pl.'s Opp'n at 6.  These postings referred to
plaintiff by abusive names and accused plaintiff of being a
sexual predator.  Pl.'s Compl. at ¶ 45, 47.  Defendants maintain
that once they became aware of the postings they took immediate

corrective action to restrict access to the websites from School District-owned computers. Romanelli Aff. at ¶ 6. Although not disputing that such action was taken, plaintiff emphasizes that the measures were not implemented until February 2004, despite the fact that he initiated the complaint in 2003. Pl.'s 56.1 at ¶ 30. In addition, plaintiff alleges that there are still some breaches of the filter established by defendants that allow employees to access the content using "proxy websites." Id. According to plaintiff, the objectionable postings remain available on the internet.

On approximately January 26, 2004, a demeaning photograph of plaintiff was found on a School District-owned computer. Shea Aff. at ¶ 29. Plaintiff claims that an independent contractor working for the School District, Chris Diaz, was responsible for placing certain photographs of plaintiff on defendants' server. Harris 50-H at 71-74. Upon investigation, the actual source of the photographs could not be determined, but a secretary who had one of these photographs on her computer was disciplined. Shea Aff. at ¶ 29.

**Harassment By Plaintiff Of School District Board Members**

On November 4, 2004, several board members of the School
District complained that plaintiff was engaging in conduct that
made them feel uncomfortable. Shea Aff. at ¶ 34. Shea sent
plaintiff a letter alleging that plaintiff had been:
(1) following board members in his car; (2) making repeated
telephone calls and sending emails to their homes and places of
business; and (3) visiting their homes in attempts to speak with
them concerning his working conditions. Shea Aff. Ex. N. Shea's
letter reprimanded plaintiff for his inappropriate conduct and
instructed him to cease contacting board members. Plaintiff
denies that he followed board members in his car, and claims that
the complaints are nothing more than added attempts by defendants
to retaliate against him. Pl.'s Compl. at ¶ 54; Pl.'s 56.1 at
¶ 42.

**Discussion**

**( 1 )**

**Statute of Limitations**

Plaintiff's claims regarding retaliatory incidents occurring
prior to August 10, 2003 are untimely under the three-year
statute of limitations for Section 1983 actions arising in New

York.  Plaintiff argues that these claims, though more than three years old, are saved by the continuing violation doctrine, on the ground that all of the acts of retaliation constitute one unlawful employment action.  This argument fails for two reasons.  First, the continuing violation doctrine does not apply to discrete employment actions.  Second, plaintiff cannot demonstrate either that the untimely incidents of harassment were linked to the timely actions of retaliation or that defendants tolerated such harassment by permitting it to continue without remedy.

**(A) Facially Timely Claims**

Plaintiff's retaliation claim is, at the very least, timely with regard to retaliatory actions taken by defendants between August 10, 2003 and August 10, 2006.  Defendants argue that plaintiff's First Amendment retaliation claim[6] is untimely because the complaints which form the basis of the allegation were initiated in 2001, five years before the filing of the complaint in the present action.  Section 1983 claims arising in New York

_____

[6] Plaintiff makes clear that retaliation, not discrimination, was the sole motive behind defendants' abusive conduct towards him.  However, to the extent that plaintiff's papers suggest a discrimination claim, such a cause of action must fail because he neither alleges that he was a member of a protected class nor that he was subjected to a hostile work environment as a result of that membership.  See Kassner v. 2nd Avenue Delicatessen Inc., 496 F.3d 229, 241 (2d Cir. 2007) (confirming that to establish a discriminatory hostile work environment claim a plaintiff must demonstrate that she was subjected to hostility as a result of her membership in a protected class).

are governed by a three-year statute of limitations. <u>Eagleston v. Guido</u>, 41 F.3d 865, 871 (2d Cir. 1994). Under federal law, a plaintiff's Section 1983 "claim accrues once the plaintiff knows or has reason to know of the injury which is the basis of his action." <u>Veal v. Geraci</u>, 23 F.3d 722, 724 (2d Cir. 1994) (internal quotation marks and citation omitted). Although plaintiff's complaints which form the basis of his retaliation claim occurred more than three years prior to the expiration of the relevant statute of limitations period, the point of accrual is not when plaintiff utters the alleged protected speech, but rather when he suffers retaliatory action as a result of that speech. <u>See</u> <u>Washington v. County of Rockland</u>, 211 F. Supp. 2d 507, 511-12 (S.D.N.Y. 2001) (finding that "[b]ecause plaintiffs' First Amendment retaliation claims focus on the commencement of full disciplinary hearings, the date of the respective hearings is the date that a cause of action would accrue."). Accordingly, all action occurring within three years of August 10, 2006 are timely.

**(B) The Continuing Violation Doctrine**

Plaintiff attempts to defeat the statute of limitations defense, with regard to defendants' conduct before August 10, 2003, by arguing that such untimely retaliatory actions fall within the continuing violation exception. Under the continuing violation doctrine, "a plaintiff who files a timely . . . charge

23

about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997).

**(i) Discrete Employment Actions**

Some of the pre-August 10, 2003 incidents are not saved by the continuing violation doctrine because they are discrete employment actions. The continuing violation doctrine does not apply to discrete and easily identifiable employment actions such as "termination, failure to promote, denial of transfer, or refusal to hire." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). Such discrete "acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," and "each discrete act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113. Plaintiff claims that defendants retaliated against him by: (1) asking him to resign in a December 18, 2001 meeting; (2) denying him a promotion to Lead IMC technician in 2001; (3) transferring him to the AV Department in 2002; and (4) reassigning him to work the night shift in September 2002, effectively denying him the opportunity to work overtime.

The continuing violation doctrine does not apply to save these claims as each one is a discrete employment action taken by defendants more than three years before the filing of the complaint on August 10, 2006.  See Sundaram v. Brookhaven Nat'l Labs., 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006) (holding that the continuing violation doctrine "does not apply to discrete, completed employment actions such as transfers, failures to promote, demotions, or inadequate wages.").

**(ii) Hostile Work Environment**

Plaintiff cannot demonstrate that the remaining pre-August 10, 2003 incidents were part of a continuing violation because the alleged retaliation was comprised of isolated acts of harassment and because the evidence demonstrates that defendants attempted to remedy such harassment.  A hostile work environment claim, unlike a discrete employment action, will be treated as a continuing violation where the claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  Morgan, 536 U.S. at 117; see also Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 134 (2d Cir. 2003).  "[T]he continuing violation theory may be used where there have been specific and related instances of discrimination, and the employer has permitted them to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination."

<u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 362 (2d Cir. 2001).
Where such a showing is made, the hostile work environment claim
will be "timely so long as one act contributing to the claim
occurred within the statutory period; if it did, 'the entire time
period of the hostile environment may be considered by a court
for the purposes of determining liability.'" <u>Patterson v. County
of Oneida, New York</u>, 375 F.3d 206, 220 (2d Cir. 2004) (quoting
<u>Morgan</u>, 536 U.S. at 117).

### a. Link Between Untimely and Timely Acts of Harassment

First, plaintiff fails to demonstrate that the specific acts
of retaliation were in any way related. He simply concludes,
without providing any evidence, that the harassment he was
subjected to, starting in 2001, constituted an ongoing policy of
retaliation. The untimely incidents of retaliation consist of
harassment from: (1) Fasano, who, between 2001 and 2002, spoke to
plaintiff in a demeaning manner, threatened to start a "paper
war" against him, instituted offensive work rules, placed a false
disciplinary memorandum in plaintiff's work file, intimidated
plaintiff by destroying school property in front of him,
discarded plaintiff's CD player, berated plaintiff by calling him
senior technician, took pictures of plaintiff's daughter's class
room, accused plaintiff of computer theft and violently pushed
plaintiff against a wall; (2) Shea, who in 2001, lied to
plaintiff about the withdrawal of the Lead IMC Technician

position and advised plaintiff to seek psychological help;
(3) Carpenter, who in September 2002, filed an unjustified police
report against plaintiff for stealing computer equipment; and
(4) Brtalik, who in 2002, refused to communicate with plaintiff
and filed a harassment complaint against him.

Plaintiff claims that the hostile work environment continued
in 2003 and 2004 as demonstrated by the timely incidents of
harassment.  Specifically, (1) Brtalik filed a criminal and work-
related harassment complaint against plaintiff in April 2004,
filed an additional complaint against plaintiff for tailgating
him in June 2004, posted an offensive cartoon about plaintiff
over his desk and made it difficult for plaintiff to perform his
job duties by intentionally hiding work equipment; (2) in 2003,
defendants' employees participated in offensive internet
postings, which referred to plaintiff by abusive names; (3) an
independent contractor placed demeaning photographs of plaintiff
on the School District server; (4) plaintiff was falsely accused
of sexual harassment by a non-school employee in a letter dated
October 1, 2003; (5) Shea accused plaintiff, on November 4, 2004,
of following School Board members in his car and told plaintiff
to cease such activity; and (6) Carpenter left inappropriate
messages about plaintiff in March 2004.

With the exception of plaintiff's problems with Brtalik,[7] all of the untimely incidents of harassment are wholly unrelated to the timely acts of abuse.  In order to fall within the continuing violation exception, the incidents of harassment "must not be 'isolated and sporadic outbreaks of discrimination,' but a 'dogged pattern.'"  <u>Sunshine v. Long Island Univ.</u>, 862 F. Supp. 26, 29 (E.D.N.Y. 1994) (quoting <u>Bruno v. Western Elec. Co.</u>, 829 F.2d 957, 961 (10th Cir. 1987)).  Many of the untimely incidents of harassment that plaintiff suffered resulted from actions taken by completely different employees from those involved in plaintiff's timely harassment claims.[8]  <u>See</u> <u>Wang v. New York City Dep't of Finance</u>, No. 96-CV-5170, 1999 WL 529550, at *11 (E.D.N.Y. 1999) ("These alleged acts of discrimination do not amount to a continuing violation.  They are neither similar nor clearly related to each other.  The circumstances surrounding each, including the parties involved, vary significantly.").  Moreover, the timely incidents, with the exception of plaintiff's problems with Brtalik, have nothing to do with the untimely acts of harassment, even assuming they were all motivated by

---

[7] Although the numerous incidents of harassment that plaintiff suffered at the hands of Brtalik appear to be connected, as discussed further <u>infra</u>, plaintiff cannot demonstrate that such actions fall within the continuing violation doctrine since defendants attempted to remedy the situation on several occasions.

[8] There is no evidence regarding which employees were involved in posting offensive comments about plaintiff on the Internet.

retaliation.  See Falinski v. Kuntz, 38 F. Supp. 2d 250, 258 (S.D.N.Y. 1999) (finding that the plaintiff's retaliation claim, which is based on two timely claims and a number of patently unrelated acts that occurred outside of the statutory period are wholly unrelated except in the plaintiff claiming that they resulted from the same improper retaliatory motive).  "Plaintiff cannot now resurrect these stale claims by stating that dissimilar acts are related.  To hold otherwise would turn the continuing violation doctrine into a 'boundless exception' to the statute of limitations."  Id.

### b. Defendants' Response To Plaintiff's Harassment

Moreover, even if the acts of harassment were somehow connected, in order to invoke the continuing violation doctrine, plaintiff must demonstrate that defendant "permitted [the harassment] to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination."  Fitzgerald, 251 F.3d at 362 (emphasis added).  Plaintiff, however, cannot establish that such a policy existed where defendants attempted to remedy each of plaintiff's numerous complaints of harassment.  Specifically, defendants: (1) investigated Fasano and eventually forced him to retire in August 2002 as a result of plaintiff's allegations; (2) met with plaintiff to discuss the Lead IMC Technician job to clarify any misunderstandings as to the status of the position;

29

(3) tried to separate plaintiff and Brtalik by both changing
their shift times and eventually moving Brtalik to a new
building; (4) reprimanded Carpenter for leaving inappropriate
messages referencing plaintiff; (5) investigated the source of
the demeaning pictures of plaintiff found on the School District-
server; and (6) prevented employees from accessing the offensive
Internet posts referencing plaintiff.  Defendants clearly did not
leave plaintiff's harassment unremedied.  Although the mutual
problems between Brtalik and plaintiff span several years, there
is no doubt that defendants took every step in their power to
avoid further confrontations between the two employees.  Thus,
the harassment that plaintiff suffered at the hands of his
supervisor and co-workers could not constitute a single unlawful
employment practice.  Accordingly, all incidents of harassment
and adverse employment actions suffered by plaintiff prior to
August 10, 2003 cannot constitute a continuing violation, and
therefore are untimely.

### (2)

### Timely Filed Retaliation Claims

Defendants next argue that they are entitled to summary
judgment on plaintiff's timely claims for retaliation.  A <u>prima</u>
<u>facie</u> case of First Amendment retaliation requires the plaintiff

to show that: (1) the speech at issue was constitutionally protected; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected speech and the adverse employment action, such that the speech was a substantial or motivating factor in the adverse employment action. Morris v. Lindau, 196 F.3d 103, 110 (2d Cir. 1999).

**(A) Protected speech**

First, plaintiff cannot demonstrate that any of his numerous complaints constitute protected speech because they all center on his personal grievances as an employee and not on matters of public concern. The speech over which plaintiff claims to have suffered retaliation include his complaints about the School District's violation of civil service law, and his complaints concerning Fasano's abusive behavior, acts of theft, destruction and misuse of School District property and inappropriate and abusive conduct on School District premises.[9] Defendants, on the other hand, contend that plaintiff's speech was unprotected as it was motivated primarily by advancing plaintiff's personal interests, including trying to get back at Fasano for supporting Carpenter's promotion.

---

[9] To the extent that plaintiff claims that defendants retaliated against him for his numerous complaints about the abusive behavior he suffered at the hands of his co-workers, such complaints cannot be considered protected speech as they concerned purely private matters. Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003).

As a public employee, plaintiff's speech is constitutionally protected if it was "made as a citizen on matters of public concern rather than as an employee on matters of personal interest." Grillo v. New York City Transit Auth., 291 F.3d 231, 235 (2d Cir. 2002). "Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). Whether an employee's speech addresses a matter of public concern is an issue of law, not fact, that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. In deciding whether speech addresses a matter of public concern, "the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999). "If the speech . . . is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern." Ganim, 342 F.3d at 112. Thus, speech concerning purely private matters, such as an employee's dissatisfaction with the conditions of his employment, is usually unprotected. Lewis, 165 F.3d at 164. In performing its analysis, a court "must look behind pretextual 'public concern'

rationales proffered by plaintiffs and attempt to discern whether their conduct, taken as a whole, was actually meant to address matters of public concern or was simply a vehicle for furthering private interests." <u>Pappas v. Giuliani</u>, 118 F. Supp. 2d 433, 444 (S.D.N.Y. 2000). "The key inquiry is whether the statements were made by plaintiff in [his] role as a disgruntled employee or [his] role as a concerned citizen." <u>Haniq v. Yorktown Cent. Sch. Dist.</u>, 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005).

### (i) Civil Service Law Violations Complaint

Plaintiff's complaint concerning defendants' civil service law violations is not protected speech because it focuses on purely private matters. Although plaintiff alleges that his complaint regarding Carpenter's promotion centered on defendants' alleged violations of civil service law, his October 24, 2001 letter to Shea,[10] which is filled with references to his desire and qualifications for the Lead IMC Technician position, demonstrates that plaintiff was more concerned with the fact that he was passed over for a promotion. Moreover, the letter fails to even explicitly mention defendants' violation of civil service law.

---

[10] Although plaintiff claims that he made numerous complaints about defendants' civil service law violations, the only evidence presented concerning his complaints on this topic is the October 24, 2001 letter addressed to Shea.

**(ii) Written Complaint Against Fasano**

The misconduct allegations against Fasano, contained in plaintiff's December 8, 2001 letter, are similarly focused on plaintiff's personal interests. In the December 2001 letter that plaintiff entitles "Job Performance review for Vincent Fasano," plaintiff complains, among other things, that: (1) he had to help Fasano with his private business, including answering phone calls, accepting equipment for repair from Fasano's personal customers and once helping Fasano install a video projector; (2) Fasano had a problem with plaintiff bringing his own equipment into the office and discarded plaintiff's personal CD player on one occasion; (3) Fasano was very argumentative and refused to do things the way plaintiff suggested; (4) Fasano would not solve computer-related problems properly, forcing others employees, including plaintiff, to deal with the same issues later on; (5) Fasano refused to remove a pinup calendar despite plaintiff having voiced his objections to it; and (6) Fasano berated plaintiff by calling him "senior technician" even though Fasano knew that Carpenter had already been appointed Acting Lead IMC Technician.

These allegations clearly focus on plaintiff's personal grievances against Fasano. The only matter that plaintiff addresses which even remotely constitutes a matter of public concern is Fasano's engagement in a private business during work

hours. However, plaintiff is more preoccupied with how such activity inconvenienced him. See Woods v. Enlarged City Sch. Dist. of Newburgh, 473 F. Supp. 2d 498, 531 (S.D.N.Y. 2007) ("In the present case, it is abundantly clear that plaintiff's complaints regarded her individual employment and the manner in which she was treated at the workplace. . . . Plaintiff's speech was not designed to reveal District-wide racism, or address the impact of racism on the school environment, but rather, she was attempting to alleviate her own personal situation in the workplace.").

Although the remaining complaints contained in the December 2001 letter appear to focus on matters of public concern, looking at the record as a whole makes clear that these allegations were incidental to plaintiff's actual motive, expressing his personal grievances. Specifically, plaintiff alleged that Fasano (1) used School District-owned vehicles for non-school business; (2) often disappeared during the work-day without letting anyone else know where he was going; (3) destroyed school-owned property because of his temper; (4) ordered equipment, which he used for himself instead of distributing to those for whom such equipment was ordered; and (5) was a danger to those around him as a result of his bad moods.

The fact that plaintiff spoke about Fasano stealing and destroying School District property and equipment, using School

District property and equipment for his own personal use and acting inappropriately and violently in front of co-workers does not necessarily make his speech a matter of public concern. Plaintiff himself admitted that he perceived Fasano's violent destruction of school property as an attempt by Fasano to intimidate him. Similarly, plaintiff's complaints about Fasano's moods are concentrated on how such behavior impacted him personally. <u>See</u> Shea Aff. Ex. C at ¶ 11 ("When [Fasano] is in one of his 'moods' it is best to avoid him altogether, as in leaving the shop and him alone, If you do not it can be a very scary scenario."). Furthermore, plaintiff, despite admitting to having been abused and harassed by Fasano for numerous years, decided to lodge his first written complaint a mere ten days after being formally informed of Carpenter's promotion. This fact is particularly relevant with regard to plaintiff's motive for filing the complaint because the last accusation that plaintiff makes against Fasano in his December 2001 letter is that his former supervisor berated him by referring to him as senior technician despite being aware of Carpenter's promotion.

Plaintiff's numerous allegations concerning Fasano's misuse of school property and general unavailability as a result of Fasano being involved in working for his private business are the only complaints that are not entirely based on plaintiff's personal grievances. However, as demonstrated, looking at all of

the complaints contained in the letter as a whole in addition to the content and context of the entire record, "[a]ny motivation [that plaintiff may have had] to advance [such] public interest was tenuous and incidental." Haniq, 384 F. Supp. 2d at 722 ("While plaintiff is correct that speech involving an employer's violation of state law will often be a matter of social and political concern, here the facts do not suggest that plaintiff was motivated either by a desire to protect the public welfare or a desire to bring the state's alleged wrongdoing to light. To the contrary, it is clear that plaintiff's speech related primarily if not exclusively to her desire to protect her job and/or her reputation as a school counselor.") (citing Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991)).

**(iii) Harassment Complaint Against Fasano**

Finally, plaintiff was also not involved in protected speech when, in Spring 2001, he complained about Fasano's abusive behavior. There is no evidence on exactly how the complaint was communicated, but it appears to have been made privately to a supervisor named Rosemary Ruk. See Burns v. Cook, 458 F. Supp. 2d 29, 40 (N.D.N.Y. 2006) (finding that the plaintiff's speech was not protected where "[p]laintiff communicated this speech in a private and direct manner with no apparent intention of voicing her discontent to the public at large."). There is also nothing

to suggest that plaintiff complained to Ruk about anything other than Fasano's abusive behavior towards him. "When a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor . . . he or she is speaking as an employee and not as a citizen." <u>Weintraub v. Bd. of Educ. of City of New York</u>, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2007). It is clear, therefore, that on lodging his first complaint against Fasano in Spring 2001, plaintiff was speaking directly to a supervisor as an employee about his own welfare and job security. Thus, none of plaintiff's complaints can be deemed protected speech.

**(B) Materially Adverse Action under <u>Burlington Northern</u>**

Even if plaintiff could establish that his complaints were protected speech, there is no evidence suggesting that the hostile work environment he was subjected to constituted a materially adverse action since it would not have prevented a reasonable worker from exercising their right to free speech. Furthermore, such harassment on the part of plaintiff's co-workers cannot be imputed on defendants who attempted to remedy such abuses. "In the context of a First Amendment retaliation claim, [The Second Circuit has] held that '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.'" <u>Zelnik v. Fashion Inst.</u>

of Tech., 464 F.3d 217, 225 (2d Cir. 2006) (quoting Washington v. County of Rockland, 373 F.3d 310, 320 (2d. Cir. 2004)). An adverse employment action refers not only to demotion, but includes refusal to hire or promote, reduction in pay and reprimand. Zelnik, 464 F.3d at 226. "This list of retaliatory conduct is certainly not exhaustive, however, and 'lesser actions may also be considered adverse employment actions.'" Id. (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." Id. (quotation marks omitted) (quoting Hoyt v. Andreucci, 433 F.3d 320, 328 (2d Cir. 2006)).

In Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), the Supreme Court appeared to have changed the standard under which a court is to analyze whether an action is materially adverse in the context of a retaliation claim. The Court held that in order to prevail on a retaliation claim under Title VII "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" Burlington Northern, 548 U.S. at 67-68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006); see also Zelnik, 464 F.3d at 227 ("[The Second Circuit's] standard for First

Amendment retaliation claims has always been the equivalent to the standard set forth in Burlington Northern"). To meet this standard, a plaintiff need not demonstrate that he suffered a "material change in employment terms or conditions." Zelnik, 464 F.3d at 227. Although not entirely settled, several courts agree that Burlington Northern lowered the standard for finding an adverse employment action in the context of a retaliation claim. See Thomas v. Atmos Energy Corp., No. 06-30514, 2007 WL 866709, at *5 (5th Cir. March 21, 2007) ("acknowledging that "Burlington Northern set a lower threshold for finding an adverse employment action"); Hout v. City of Mansfield, 550 F. Supp. 2d 701, 734 (N.D. Ohio 2008) (same); Ghent v. Moore, 519 F. Supp. 2d 328, 335 n. 4 (W.D.N.Y. 2007) (noting that in Burlington Northern, "the Supreme Court held that a lower standard for 'adverse actions' applies to claims of unlawful retaliation than to claims of unlawful discrimination"); Khan v. HIP Centralized Lab. Servs., Inc., No. CV-03-2411, 2007 WL 1011325, at *10 (E.D.N.Y. March 30, 2007) (finding that under Burlington Northern,"a lower standard for retaliatory hostile work environment claims may be appropriate."). What remains clear even after Burlington Northern is that "[a] plaintiff cannot support . . . a determination [that an action was adverse] unless he can show that an alleged act of retaliation is more than de minimis." Zelnik, 464 F.3d at 226. "Indeed, '[i]t would trivialize the

First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . .'" Id. (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).

**(i) Hostile Work Environment**

Even a cursory glance at a majority of plaintiff's hostile work environment claims demonstrates that they fail to meet the more liberal Burlington Northern test.[11]  With regard to the offensive internet postings by anonymous co-employees, demeaning pictures found on defendants' server, the complaint of sexual harassment from a non-employee and Carpenter's offensive messages about plaintiff, each action is "individually de minimis and, even together, insufficiently serious to be considered an actionably 'critical mass.'" Rosenblatt v. City of New York, No. 05 Civ. 5521, 2007 WL 2197835, at *7 (S.D.N.Y. July 31, 2007). Such actions are thus not materially adverse under the Burlington Northern standard and would surely not be considered materially adverse under the old severe or pervasive standard.

Plaintiff is also unable to impute to defendants the harassment that he suffered at the hands of his co-workers either because they were unaware of the incidents or, when informed,

---

[11] Plaintiff fails to argue for the application of the Burlington Northern standard.  Instead, plaintiff cites to the old standard that would have required him to show that the harassment he suffered was sufficiently severe or pervasive such that it altered the conditions of his employment.  See Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).

because they took appropriate remedial action.  Burlington
Northern did not change the fact that to make out a claim for
hostile work environment a plaintiff must also demonstrate "that
a specific basis exists for imputing the objectionable conduct to
the employer."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.
2002) (citing Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d
Cir. 1997)).  "[W]hen no tangible employment action is taken
against the employee, the employer may establish an affirmative
defense to liability or damages by showing that [sic] (a) that
the employer exercised reasonable care to prevent and correct
promptly any harassing behavior, and (b) that the plaintiff
employee unreasonably failed to take advantage of any preventive
or corrective opportunities provided by the employer or to avoid
harm otherwise."  Pilgrim v. McGraw-Hill Companies, Inc., --- F.
Supp. 2d ----, 2009 WL 440370, at *26 (S.D.N.Y. Feb. 18, 2009)
(citing Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998);
Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)).
"An employer's remedy need not necessarily expel the harasser
from the work environment to be effective, but rather it should
be sufficiently calculated to end the harassment."  Stepheny v.
Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248,
266 (E.D.N.Y. 2005) (quotation marks omitted) (quoting Gonzalez
v. Beth Israel Med. Ctr., 262 F. Supp. 2d 342, 355 (S.D.N.Y.
2003)).  The harassment that plaintiff allegedly suffered at the

hands of Brtalik cannot be imputed to defendants, who instituted reasonable measures to prevent further mutual harassment between plaintiff and Brtalik, by both changing their shift hours and eventually transferring Brtalik to a new building.  See Rios v. Buffalo and Fort Erie Pub. Bridge Auth., No. 04-CV-375A, 2008 WL 657121, at *5 (W.D.N.Y. March 7, 2008) ("Where a hostile work environment is created by non-supervisory co-workers, an employer's liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action" (citing Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004))).  Moreover, even plaintiff admits that the offensive cartoon that Brtalik created was taken down by a supervisor, at plaintiff's request.

It is also undisputed that defendants remedied plaintiff's remaining allegations of harassment by: (1) restricting access to websites that referred to plaintiff by abusive names; (2) investigating the source of the demeaning pictures and disciplining the employee on whose computer one of the images was found; (3) investigating the complaint of sexual harassment, clearing plaintiff of all charges and reinstating him to work; and (4) reprimanding Carpenter for leaving offensive recorded messages referencing plaintiff.  See Rios, 2008 WL 657121, at *7 (refusing to impute liability on the defendant employer where

"the undisputed evidence shows that each time the [employer] learned of inappropriate or offensive conduct by non-supervisory employees, it acted immediately by sending out memorandums reiterating its anti-harassment policy, conducting investigations to ascertain the perpetrator or perpetrators, and warning employees that such conduct will not be tolerated.").

Plaintiff fails to bring forth any evidence demonstrating that defendants' responses to his complaints were unreasonable. Plaintiff claims that defendants did not respond quickly enough to block access to the Internet sites containing posts about him. According to plaintiff, he informed defendants of the posts in 2003, but defendants did nothing to remedy the situation until February 2004.  Plaintiff, however, does not provide the specific date on which he made his complaint.  He also fails to allege why it was unreasonable for defendants not to have acted sooner. Without more, plaintiff cannot show that defendants' response was unreasonable.  See Rios, 2008 WL 657121, at *7 ("It is the plaintiff's burden to prove that the defendant acted unreasonably in responding to complaints of co-worker harassment."). Plaintiff also claims that employees were able to access the content of the offensive Internet posts through "proxy websites," but he never alleges that defendants were even informed of this problem.

**(ii) Discrete Employment Actions**

Looking at the record in the light most favorable to plaintiff, the only timely actions that remotely constitute discrete employment actions are: (1) the Title IX investigation conducted into allegations that plaintiff walked in on female students while they were dressing; (2) plaintiff being placed on administrative leave during the pendency of the investigation; (3) Shea reprimanding plaintiff for allegedly harassing board members about his work-related problems; and (4) plaintiff changing his work status from a ten-month employee to a twelve-month employee. There is no need to address whether these employment actions are categorized as adverse under the more liberal standard established by <u>Burlington Northern</u> since plaintiff cannot establish that they were in any way connected to his complaints.

**(C) Causal Connection**

Plaintiff is unable to raise a genuine issue of material fact as to whether a causal connection existed between his free speech and the alleged materially adverse actions he suffered. In conclusory fashion, plaintiff alleges that "[d]efendants' conduct, which occurred after Plaintiff's complaints, sufficiently shows a causal connection to Plaintiff's complaints and the adverse employment action." Pl.'s Opp'n at 17. In a retaliation action "[t]he causal connection must be sufficient to

45

warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action,, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). The causation element can be established either directly by bringing forth evidence of retaliatory animus or indirectly through circumstantial evidence, such as showing that the protected speech was closely followed by the adverse employment action. Id.

**(i) Discrete Employment Actions**

Plaintiff introduces no evidence suggesting that his complaints had anything to do with defendants' discrete employment actions other than that the employment actions took place after his complaints. Such bare allegations are insufficient, especially where the alleged retaliation occurred years later. For example, Shea's November 4, 2004 letter reprimanding plaintiff for harassing board members was sent almost three years after plaintiff's December 8, 2001 complaint against Fasano for engaging in improper conduct, and more than three years after his October 24, 2001 letter to Shea complaining about defendants' violation of civil service law. Similarly, the Title IX investigation was conducted in November 2003, approximately two years after plaintiff's complaints. Such gaps of time are far too long, as a matter of law, to establish a

46

nexus between plaintiff's free speech and defendants' retaliatory action via their proximity to each other.  See Peres v. Oceanside Union Free Sch. Dist., No. 05 Civ. 1807, 2008 WL 305342, at *14 (E.D.N.Y. Jan. 31, 2008) (finding that "the passage of over one year between the time of Plaintiff's last complaint and [the adverse employment action] is too long to raise a question of fact on causation."); see also Ludwiczak v. Hitachi Capital Am. Corp., 528 F. Supp. 2d 48, 60 (D. Conn. 2007) ("In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship."). Additionally, the investigation was launched not because of allegations made by any of the defendants but because of allegations made by D'Amore, who plaintiff never alleges was even employed by defendants.  Plaintiff attempts to draw a causal connection between his 2001 complaints against Fasano and the 2003 sexual harassment investigation by asserting that D'Amore's lighting director was business partners with Fasano at the time the accusations were made against him.  Even assuming the truth of this assertion, such a tenuous connection provides little support for plaintiff's claim that the allegations were motivated by his complaints against Fasano.  Moreover, it fails to create a link to defendants, who had already forced Fasano to retire by August 2002.

**(ii) Hostile Work Environment**

Plaintiff similarly fails to draw a connection between the alleged hostile work environment he suffered and his exercise of free speech. All of the timely harassment allegations occurred between 2003 and 2004, approximately two to three years after plaintiff's complaints about Fasano and the civil service law violations. Plaintiff produces no evidence indicating that the names he was called on the Internet posts in 2003, the inappropriate messages that Carpenter made referencing plaintiff in March 2004 or the demeaning pictures of plaintiff that were placed on the defendants' server sometime in January 2004, had anything to do with his 2001 complaints.

With regard to the harassment he suffered at the hands of Brtalik, the only retaliatory connection drawn by plaintiff is that the abuse began after Brtalik found out about plaintiff's complaints against Fasano. Although "[a] close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse action is alone sufficient to establish causation, . . . if temporal proximity alone is the basis for determining a causal connection, it must be <u>very</u> close." <u>Parrish v. Sollecito</u>, 258 F. Supp. 2d 264, 268 (S.D.N.Y. 2003) (internal citation omitted) (emphasis added). Here, plaintiff fails to even allege the particular time period during which Brtalik found out about his complaints against Fasano.

48

Additionally, the evidence suggests that plaintiff's problems with Brtalik were personal in nature rather than being retaliation for plaintiff's protected speech. For example, in his September 6, 2002 letter, Brtalik complains that he was unable to tolerate plaintiff because of plaintiff's inappropriate and abusive conduct. <u>See</u> Shea Aff. Ex. G. Similarly, Brtalik's April 13, 2004 email to Shea complained of plaintiff's "violent, [and] very intimidating series of outbursts." Shea Aff. Ex. K. Furthermore, Brtalik's offensive cartoon does not appear to have been inspired in any way by plaintiff's alleged exercise of free speech. Instead, it appears to be a continuation in the series of mutually abusive actions between co-workers.

### (3)

### Untimely Retaliation Claims

Even looking at plaintiff's time barred claims, it is clear that defendants consistently investigated plaintiff's complaints and took remedial action at every step, further demonstrating that the harassment plaintiff suffered was not the result of a policy of tolerating retaliation.[12] For example: (1) when Fasano

---

[12] Untimely incidents of harassment may be relevant in understanding and analyzing plaintiff's timely retaliation claims. <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 176-77 (2d Cir. 2005) (stating that "relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability

instituted new work rules, defendants met with plaintiff to discuss his objections to the rules and reached certain compromises; (2) when plaintiff complained about Fasano's inappropriate work behavior, defendants met with plaintiff and later conducted a full investigation, which resulted in Fasano's early retirement; and (3) when plaintiff complained about Carpenter receiving the Acting Lead IMC Technician position over him, defendants met with plaintiff to discuss the status of the position.  Plaintiff claims that during a December 18, 2001 meeting following his comments about not being able to work with Carpenter and Fasano, Aldrich asked that plaintiff resign. Although, as stated earlier, this claim is time barred, such a statement, assuming it was even made, cannot be deemed a materially adverse action where plaintiff never followed through with resigning.  <u>See</u> <u>Pugni v. Reader's Digest Ass'n, Inc.</u>, No. 05 Civ. 8026, 2007 WL 1087183, at *23 (S.D.N.Y. April 9, 2007) ("Under [the <u>Burlington Northern</u>] standard, it is clear that [a supervisor's] alleged 'threat' that plaintiff's days at Reader's Digest are numbered did not constitute a materially adverse action.  The alleged threat, assuming it happened, was never carried out.").  Moreover, shortly thereafter, defendants reassigned plaintiff to a new supervisor, where he no longer had to interact with either Fasano or Carpenter, as plaintiff had

---

 on the timely alleged act.").

requested.  Plaintiff presents no evidence demonstrating an issue of material fact as to whether any actions or statements made by defendants during the course of their dealings with him had anything to do with his various complaints.  Accordingly, plaintiff's First Amendment retaliation claim is dismissed.[13]

### (4)

### State Law Claims

If a district court dismisses all claims over which it has original jurisdiction, it may, in its discretion, decline to exercise supplemental jurisdiction over state law claims.  28 U.S.C. § 1367(c)(3);  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 102-03 (2d Cir. 1998).  Plaintiff's claims for negligent infliction of emotional distress, violations of civil

---

[13] A municipality can be held liable as a "person" under Section 1983 if "the alleged unlawful action implemented or was executed pursuant to a governmental policy or custom."  Reynolds v. Giuliani, 506 F.3d 183, 190 (2d Cir. 2007) (citing  Monell v. Dep't of Social Servs. of the City of New York, 436 U.S. 658, 691 (1978)).  In the present action, plaintiff merely asserts in conclusory fashion that "[he] has sufficiently alleged in the Complaint a claim for a 'Custom, Practice or Policy' violation under § 1983."  Pl.'s Opp'n at 19.  Plaintiff offers no evidence nor does he point to any specific facts demonstrating that the harassment he suffered was implemented pursuant to School District policy or custom.  In contrast, the School District seems to have done everything in its power to address each and every grievance made by plaintiff.  Accordingly, even if plaintiff was retaliated against by his co-workers and former supervisor as a result of his complaints, the School District cannot be found vicariously liable for such actions.

service law and violations of NYCHRL and NYSHRL all arise under state law.  Consequently, because plaintiff's Section 1983 claim does not survive summary judgment, these state law claims are dismissed without prejudice.


## Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted on plaintiff's federal claim.  Plaintiff's state law claims are dismissed without prejudice.  The Clerk of the Court is directed to close this case.

Dated:  Brooklyn, New York
        March 30, 2009

                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge